TODD BLANCHE
Acting Attorney General of the United States
SIGAL CHATTAH
First Assistant United States Attorney
District of Nevada
Nevada Bar Number 8264
DANIEL J. COWHIG
Assistant United States Attorney
501 Las Vegas Boulevard South, Suite 1100
Las Vegas, Nevada 89101
(702) 388-6336
daniel.cowhig@usdoj.gov
*Attorneys for the United States of America*

**FILED**
**U.S. MAGISTRATE JUDGE**

**DATE:**  April 17, 2026

**TIME:**  10:45 a.m.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>    vs.<br><br>MICHAL MIROSLAW ROKITA,<br><br>        Defendant. | Case No. 2:26-mj-00296-EJY<br><br>CRIMINAL COMPLAINT<br><br><u>VIOLATIONS</u>:<br><br>18 U.S.C. § 795 – Photographing Defense Installations<br><br>18 U.S.C. § 797 – Publication of Photographs of Defense Installations |

BEFORE the Honorable Elayna J. Youchah, United States Magistrate Judge, Las Vegas, Nevada, the undersigned Complainant, being duly sworn, deposes and states:

<u>COUNT ONE</u>
Photographing Defense Installations
18 U.S.C. § 795

Beginning no earlier than April 7, 2026, and continuing through on or about April 14, 2026, in the State and Federal District of Nevada,

MICHAL MIROSLAW ROKITA,

defendant herein, did knowingly make photographs, pictures and graphical representations of vital military installations and equipment as defined by the President in

1

Executive Order Number 10104, Definitions of Vital Military and Naval Installations and Equipment, as requiring protection against the general dissemination of information relative thereto, specifically installations and equipment of the Nevada Test and Training Range and the Tonopah Test Range, without first obtaining permission of the commanding officer of the military post, camp, or station, military aircraft, any separate military command concerned, or higher authority, and promptly submitting the product obtained to such commanding officer or higher authority for such action as he may deem necessary, all in violation of Title 18, United States Code, Section 795.

COUNT TWO
Publication of Photographs of Defense Installations
18 U.S.C. § 797

Beginning no earlier than April 7, 2026, and continuing through on or about April 11, 2026, in the State and Federal District of Nevada,

MICHAL MIROSLAW ROKITA,

defendant herein, did knowingly reproduce, publish, sell, or give away photographs, pictures and graphical representations of vital military installations and equipment as defined by the President in Executive Order Number 10104, Definitions of Vital Military and Naval Installations and Equipment, as requiring protection against the general dissemination of information relative thereto, specifically installations and equipment of the Nevada Test and Training Range and the Tonopah Test Range, without first obtaining permission of the commanding officer of the military post, camp, or station, military aircraft, any separate military command concerned, or higher authority, all in violation of Title 18, United States Code, Section 797.

PROBABLE CAUSE AFFIDAVIT

1.      I, Kate Duke, being duly sworn, hereby depose and state as follows:

2

2.     I am a Special Agent with the Air Force Office of Special Investigations ("OSI") and have been employed in that capacity since July 2019. I am currently assigned to OSI Office of Special Projects ("PJ"), Detachment 1 ("Det 1"), Las Vegas, NV, where I primarily investigate crimes associated to classified programs associated to the United States Air Force. I have statutory arrest authority under 10 U.S.C. § 9027. I am a law enforcement officer of the United States within the meaning of 18 U.S.C. § 115(c)(1), authorized by law or a government agency to engage in or supervise prevention, detection, investigation and prosecution of any violation of federal criminal law. During my career, I have led and participated in numerous criminal and national security investigations, including those involving the use of digital devices and online accounts to facilitate violations of federal law. Through the course of my training and employment with the OSI, I have used a variety of investigative techniques and resources, including the execution of search warrants and review of both physical and digital evidence collected from search warrant returns. I am familiar with the strategy, tactics, methods, tradecraft, and techniques of criminals, terrorists, and their agents. During my employment with the OSI, I attended 21 weeks of Agent Training at the Federal Law Enforcement Training Center, Brunswick, Georgia. I have received additional formal and informal training from OSI regarding criminal and counterterrorism investigations, including training concerning the use of electronic communications and digital devices in furtherance of a crime. As a federal agent, I am authorized to investigate violations of laws of the United States, and as a law enforcement officer I am authorized to execute warrants issued under the authority of the United States.

3.     I make this affidavit in support of a criminal complaint charging MICHAL MIROSLAW ROKITA with the offense set forth above. The statements contained in this

3

affidavit are based upon my investigation, information provided by other law enforcement officers, and on my experience and training as a Special Agent with OSI.

STATUTORY AUTHORITY

4.      For the reasons set forth below, there is probable cause to believe that ROKITA photographed and video- and audio-recorded the Nevada Test and Training Range (NTTR) and the Tonopah Test Range (TTR) between on or about April 7 and April 14, 2026, without approval of the installation commander, in violation of 18 U.S.C. § 795, and reproduced, published, and gave away those photographs without first obtaining the approval of the installation commander in violation of 18 U.S.C. § 797.

5.      18 U.S.C. § 795, Photographing and sketching defense installations, provides:

a) Whenever, in the interests of national defense, the President defines certain vital military and naval installations or equipment as requiring protection against the general dissemination of information relative thereto, it shall be unlawful to make any photograph, sketch, picture, drawing, map, or graphical representation of such vital military and naval installations or equipment without first obtaining permission of the commanding officer of the military or naval post, camp, or station, or naval vessels, military and naval aircraft, and any separate military or naval command concerned, or higher authority, and promptly submitting the product obtained to such commanding officer or higher authority for censorship or such other action as he may deem necessary.
(b) Whoever violates this section shall be fined under this title or imprisoned not more than one year, or both.

6.      Executive Order No. 10104, Definitions of Vital Military and Naval Installations and Equipment, 15 Fed.R. 597 (Feb. 1, 1950), defines the following, *inter alia*, as vital military installations:

1. All military, naval, or air-force installations and equipment which are now classified, designated, or marked under the authority or at the direction of the President, the Secretary of Defense, the Secretary of the Army, the Secretary of the Navy, or the Secretary of the Air Force as "top secret", "secret", "confidential", or "restricted" and all military, naval, or

4

air-force installations and equipment which may hereafter be so classified, designated, or marked with the approval or at the direction of the President, and located within:

(a) Any military, naval, or air-force reservation, post, arsenal, proving ground, range, mine field, camp, base, airfield, fort, yard, station, district, or area.

2. All military, naval, or air-force aircraft, weapons, ammunition, vehicles, ships, vessels, instruments, engines, manufacturing machinery, tools, devices, or any other equipment whatsoever, in the possession of the Army, Navy, or Air Force or in the course of experimentation, development, manufacture, or delivery for the Army, Navy, or Air Force which are now classified, designated, or marked under the authority or at the direction of the President, the Secretary of Defense, the Secretary of the Army, the Secretary of the Navy, or the Secretary of the Air Force as "top secret", "secret", "confidential", or "restricted", and all such articles, materials, or equipment which may hereafter be so classified, designated, or marked with the approval or at the direction of the President.

7.    18 U.S.C. § 797, Publication and sale of photographs of defense installations, provides:

On and after thirty days from the date upon which the President defines any vital military or naval installation or equipment as being within the category contemplated under section 795 of this title, whoever reproduces, publishes, sells, or gives away any photograph, sketch, picture, drawing, map, or graphical representation of the vital military or naval installations or equipment so defined, without first obtaining permission of the commanding officer of the military or naval post, camp, or station concerned, or higher authority, unless such photograph, sketch, picture, drawing, map, or graphical representation has clearly indicated thereon that it has been censored by the proper military or naval authority, shall be fined under this title or imprisoned not more than one year, or both.

8.    The NTTR and the TTR are designated under 18 U.S.C § 795 and Executive Order No. 10104 as vital military installations and are located within the state and federal District of Nevada.

9.    ROKITA and G.A.P., both foreign nationals travelling on passports issued by Poland, travelled to the United States, arriving in Las Vegas, Nevada, on or about April 7, 2026, with the express intent to photograph and audio- and video-record vital

military installations and equipment at the NTTR and the TTR. The NTTR and the TTR are designated under 18 U.S.C § 795 and Executive Order No. 10104 as vital military installations and are located within the state and federal District of Nevada.

10. According to United States Customs and Border Protection (CBP) records, ROKITA and G.A.P. identified the purpose of their travel as "pleasure/tourism." ROKITA and G.A.P. brought photographic and recording equipment with them, including what ROKITA described as a still and video camera with a stabilized 125X optical zoom lens, meaning that it magnified the object photographed or video-recorded 125 times.

11. After arriving in Las Vegas, ROKITA leased what he described as an off-road vehicle for the purpose of travelling to desert areas on the outer boundaries of the NTTR and TTR to photograph and video- and audio-record those military installations and military aircraft, equipment and operations within the NTTR and TTR.

12. On or about April 8, 2026, ROKITA and G.A.P. travelled to an area adjacent to the boundary of the NTTR near Tikaboo Peak, to the west of Alamo, Nevada, over 100 miles from their point of arrival at Harry Reid International Airport in Las Vegas. ROKITA and G.A.P. hiked into the desert and set up a camp in a location ROKITA believed was not readily observed by the security forces protecting the perimeter on the NTTR but afforded an unobstructed long-distance view of vital military installations and equipment within the NTTR. ROKITA set up photographic and recording equipment and began to take still photographs and video- and audio-recordings of military installations and the military aircraft, equipment and operations within the NTTR.

6

13.     ROKITA and G.A.P. remained overnight in the location where they had set up camp. ROKITA continued to photograph and audio- and video-record military installations and military aircraft, equipment and operations within the NTTR into the night. On or about April 9, 2026, ROKITA resumed those activities, again photographing and audio- and video-recording military installations and military aircraft, equipment and operations within the NTTR.

14.     On or about April 9, 2026, ROKITA travelled to a desert area near the TTR, approximately 175 miles by road from the area of Tikaboo Peak. ROKITA again hiked into the desert to an area adjacent to the boundary of the TTR. ROKITA set up photographic and recording equipment and took still photographs and video- and audio-recordings of military installations and the military aircraft, equipment and operations within the TTR.

15.     At various times since their arrival in Las Vegas, Nevada, on or about April 7, 2026, ROKITA and G.A.P. met with JOERG ARNU, a naturalized United States citizen who operates a website identified as DreamlandResort.com. DreamlandResort.com features a banner depicting signs posted by the installation at an entrance to the NTTR advising among other things that the NTTR is a United States Air Force installation and that photography of the installation is prohibited by criminal federal statute. Specifically, the signs reproduced in the banner image read in part "PHOTOGRAPHY OF THE AREA IS PROHIBITED, 18 USC 795." The following text appears on the main page of the website:

> Take an inside look at Area 51, a.k.a. Dreamland, the world's most famous secret Air Base. For 26 years and counting Dreamland Resort has been the #1 source for information on Area 51, Black Projects, the Nellis Ranges, TTR and the ET Highway. The webmaster is a 27-year Area 51

Research veteran and a resident of Rachel, NV, right outside the gates of Area 51.[1]

Below that text, as of the date of this affidavit, the website includes a link that reads: "NEW AREA 51 PHOTOS!!!"

16.    On some date on or after April 9, 2026, ROKITA met with ARNU in or near Las Vegas, Nevada, to review the photographs and video- and audio-recordings ROKITA had made of military installations and the military aircraft, equipment and operations within the NTTR and TTR. ROKITA reproduced and gave copies of at least some of the photographs and video- and audio-recordings to ARNU. ROKITA did not have permission of the commanding officer of the NTTR or the TTR or any other higher authority, to reproduce, publish, sell, or give away the photographs and video- and audio-recordings ROKITA had made of military installations and the military aircraft, equipment and operations within the NTTR and TTR. The photographs and video- and audio-recordings of military installations and the military aircraft, equipment and operations within the NTTR and TTR that ROKITA reproduced and gave to ARNU had not been reviewed and approved or censored by the proper military authority.

17.    On some date up to and including April 11, 2026, ARNU advertised a livestream event on his Dreamland Resort YouTube Channel, scheduled for April 11,

---

[1] Your affiant includes verbatim statements by ARNU, ROKITA and others to show that ROKITA knew that the NTTR and the TTR are military installations and that the installations, aircraft, equipment and operations ROKITA photographed and video- and audio-recorded within the NTTR and the TTR are military aircraft, equipment and operations. Your Affiant and the NTTR, TTR and superior commands and commanders neither confirm nor deny the accuracy of purported identifications made by ROKITA, ARNU or others as described in this affidavit beyond the NTTR, the TTR and the fact that the installations, aircraft, equipment and operations ROKITA photographed and video- and audio-recorded within the NTTR and the TTR are military aircraft, equipment and operations.

8

2026, that would feature a "surprise guest." On April 11, 2026, ROKITA and G.A.P. met with ARNU in Las Vegas, Nevada, to participate in that livestream event, which was titled "Our fearless Field Investigator Michal reports from his recent recon mission to Tikaboo Peak." ARNU broadcast the livestream event on YouTube. Access to the livestream was unrestricted. The livestream was recorded and remains available on the Dreamland Resort YouTube channel at https://www.youtube.com/live/7oHWvEJfXD8.

18.     The recording of the livestream is 1 hour, 54 minutes and 30 seconds long as measured by the YouTube player. The livestream began with a display of a title page with text "DreamlandResort.com" and "Stream starting soon …" that again featured an image of signs advising "PHOTOGRAPHY OF THE AREA IS PROHIBITED, 18 USC 795." Figure 1.

Figure 1: Livestream Title Page[2]

19.    ROKITA, G.A.P. and ARNU appeared onscreen at 0:00 elapsed time on the YouTube player. Figure 2. ROKITA stated that he and G.A.P. travelled to Tikaboo Peak the day after they arrived in Las Vegas. ARNU described the photographs taken by ROKITA as showing passenger aircraft, fighter aircraft, and helicopters in the NTTR and the TTR.

---

[2] The NTTR and TTR commands have authorized reproduction and dissemination of the images included in this complaint.

10



Figure 2: ROKITA, G.A.P. and ARNU discuss the content of the livestream at 23:00 of the livestream

20.     At approximately 23:28 in the livestream, with ROKITA, G.A.P. and ARNU present, ARNU begins to show photographs and video- and audio-recordings as just a few of the many that ROKITA made of the NTTR and the TTR over the previous days. See, for example, Figure 3. During the livestream, ROKITA and ARNU speculated about the purpose of the installations, aircraft and equipment in the NTTR that ROKITA photographed and video-recorded with the 125-power magnification of ROKITA's camera lens. ARNU points out a large screening structure and speculates that it was built to obstruct the view of an observer in the area of Tikaboo Peak.

11

Figure 3: ROKITA, G.A.P. and ARNU discuss a video-recording of installations and equipment in the NTTR at 33:00 of the livestream

21.    At various times during the livestream with ROKITA, G.A.P. and ARNU present, ARNU showed a large number of photographs and video-recordings in a scrolling banner across the top of the livestream screen, repeatedly describing those photographs and video- and audio-recordings as just a few of the many that ROKITA made of the NTTR and the TTR over the previous days. See, for example, Figure 4. ROKITA and ARNU each state at various times during the livestream that ROKITA will bring the photographs and video- and audio-recordings ROKITA made of the NTTR and the TTR back home to Poland, where ROKITA will reproduce, publish, sell, or give away the photographs and video- and audio-recordings ROKITA had made of military installations

12

and the military aircraft, equipment and operations within the NTTR and the TTR

through various means, including his own website and YouTube channel.



Figure 4: ROKITA, G.A.P. and ARNU discuss a video-recording
of aircraft operations in the NTTR at 41:40 of the livestream

22.     G.A.P. leaves the livestream at approximately 47:00.

23.     At various points during the livestream, ROKITA and ARNU discuss
photographs and video- and audio-recordings of various installations and military
equipment in and near the NTTR that ROKITA photographed and video-recorded with
the 125-power magnification of ROKITA's camera lens. See, for example, Figure 5.
During the livestream, ROKITA and ARNU speculate about the purpose of the various
items of equipment ROKITA photographed and video-recorded. At various points in the
livestream ROKITA and ARNU purport to identify what they believe to be sensor

equipment used by the NTTR to monitor and secure the perimeter of the installation, describe its location, and purport to offer advice on how to evade detection by that equipment in order to gain unauthorized access to the military installation.



Figure 5: ROKITA and ARNU discuss a video-recording of military equipment in the NTTR at 57:00 of the livestream

24.    At various points during the livestream, ROKITA and ARNU discuss photographs and video- and audio-recordings of various installations and military equipment in the TTR that ROKITA photographed and video-recorded with the 125-power magnification of ROKITA's camera lens. See, for example, Figure 6. During the livestream, ROKITA and ARNU speculate about the purpose of the various installations and equipment in the TTR that ROKITA photographed and video-recorded.

Figure 6: ROKITA and ARNU discuss a video-recording of military installations
and equipment in the TTR at 1:24:30 of the livestream

25.     At approximately 1:29:50 of the livestream, ROKITA and ARNU stop displaying the photographs and video-recordings made by ROKITA to answer questions submitted by viewers through a chat function. At approximately 1:31:50 of the livestream, ROKITA discusses measures he took that he believed helped him to avoid detection while photographing and video- and audio-recording the NTTR and offered advice to others to do the same.

26.     On or about April 14, 2026, ROKITA again travelled to an area adjacent to the boundary of the NTTR near Tikaboo Peak, hiked into the desert to a vantage point overlooking the NTTR, and took more still photographs and video- and audio-recordings of military installations and the military aircraft, equipment and operations within the

NTTR. Later that same day, ROKITA again travelled to a desert area near the TTR, hiked into the desert to an area adjacent to the boundary of the TTR, and took photographs and video- and audio-recordings of military installations and the military aircraft, equipment and operations within the TTR.

27.    On April 15, 2026, OSI PJ Det 1 confirmed with the commander of the NTTR and the TTR that he had not authorized ROKITA to photograph or video- and audio-record military installations and the military aircraft, equipment and operations within the NTTR or the TTR, nor had he authorized ROKITA to reproduce, publish, or give away those photographs or video- and audio-recordings.

CONCLUSION

28.    Based upon the information set forth in this application, your Complainant respectfully submits that there is probable cause to believe that MICHAL MIROSLAW ROKITA violated 18 U.S.C. § 795, Photographing Defense Installations, and 18 U.S.C. § 797, Publishing Photographs of Defense Installations, beginning no earlier than April 7, 2026, and continuing through on or about April 11, 2026, as described above.

Respectfully Submitted,

Special Agent Kate Duke
Office of Special Investigations
United States Air Force

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this April 17, 2026.

THE HONORABLE ELAYNA J. YOUCHAH
UNITED STATES MAGISTRATE JUDGE

16